■ In the Matter of PETER L., JR. CHRISTINA L., Appellant; JAMES KRAUS-KOPF, as Commissioner of Social Services, Respondent. — Order entered December 22, 1981 in Family Court, New York County (Marks, F. C. J.), denying appellant's application for custody of her grandchild and directing placement with a foster couple, unanimously reversed, on the law and the facts and in the exercise of discretion, without costs, authorization for foster home placement is terminated and custody to the appellant is awarded. We are asked to decide, all other factors being equal, whether the law favors a natural grandparent over a foster couple in awarding custody of a child who has been surrendered to the care of the State. After a foster care review proceeding convened pursuant to section 392 of the Social Services Law, the Family Court stated that "as a grandmother [appellant] has no greater right to the child than any other person who might be asking for the child and the agency is asking on behalf of prospective adoptive parents. I think all I have to look at in the case and all I'm permitted to look at in the case in which we have someone asking for the child who has not the great rights of the parent, is the best interest of the child. I cannot find on the basis of the evidence that has been presented and that part of the evidence that I believe that it is in the best interest of this child at this moment to go to the grandmother." Accordingly the court denied appellant's application for custody and directed that the child be "placed in a suitable adoptive home no later than January 22, 1982", and ordered a "hearing on the suitability of that home as the permanent plan for the child" be held in early February. (Record of oral decision rendered Dec. 22, 1981.) In the order from which this appeal is taken (entered Dec. 22, 1981) the court wrote similarly: "If there had been greater understanding by the agency of the grandmother when the child was first placed, there might have been a

successful placement of the child in the grandmother's home long ago. However, the court cannot correct mistakes in the past. The grandmother has no greater legal right to the child than any stranger. Were she the mother, given the facts presented, the child would be released to her as a fit although far from perfect parent; but she is not the mother. The law requires that the court consider only best interests of the child in a case of this kind. It is not in the best interests of the child to be placed with Mrs. L. She does not offer the suitable, permanent, warm home the child ought to have." After reviewing the record here, we come to the opposite conclusion and find that the best interests of the child would manifestly be better served by placing the child in his grandmother's care and custody. The child and his father lived with appellant for several years, until appellant and her son quarreled over the latter's lack of a job. The father took his son and went to live with one of his sisters, but shortly thereafter the father was killed in an undescribed incident of street violence. The aunt, an admitted drug addict and estranged from her mother, turned the boy over to the State and thereafter committed herself to a drug rehabilitation program. The Commissioner of Social Services very quickly[1] located the natural mother and secured from her a full surrender of the child for placement. (See Social Services Law, § 384-a.) The commissioner than filed a petition to continue foster care, notifying appellant, the paternal grandmother. This action followed. The agency opposed the grandmother's application for custody, although its initial plan was to place the boy with her. Part of the objections seemed to center on the woman's "extremely overprotective nature" in not feeling it was safe for the (then) five year old to play outside in what is admittedly a high-crime neighborhood. Further objection was voiced to the grandmother's pinning a picture of the child's father onto the boy's lapel so "that he should remember his own father" and having a picture of the father, in a casket, on the wall over the dining room table. And allegedly appellant told the boy that it was his duty, when he grew up, to avenge his father's death. In sum, the agency argued that the isolated, lonely, embittered existence of the grandmother (whose first son had also been killed in street violence) would not be a proper home for the boy and that while appellant might be emotionally gratified to win the child, it was not in the boy's best interest to be placed there. In adopting this conclusion the Family Court essentially ignored a host of facts and factors indicating that appellant offers a loving and close-knit family environment which the boy responds to well and to which back-up support is quite adequately available. For instance, while the grandmother is perhaps overly protective of the child's safety, her married daughter visits weekly, either bringing her child with her or taking the boy to parks in her own neighborhood. This married sister (and her husband) are clearly an available back-up resource in many ways. But, as this daughter puts it, the boy and his grandmother "have a great love for each other. They have a certain chemistry between them when they are together. Even when he was with me in my house he couldn't wait until he saw his grandmother. That is why sometimes he didn't sleep over in my house."[2] We perceive that part of the agency's opposition stems from concern about the Greek cultural practices which are pronouncedly a part of the grandmother's character and certainly this child's heritage. The Greek psychologist explained, for example, that mourning "is very ceremonial and lasts a long time". Black is worn by adults for three to five years, there is "lots of discussion about death, about where the person goes after death," a "picture of the deceased on the grave and in the

1. Ten days after the father's death.
2. Even the agency's social worker admitted that she "observed warmth and love during the interaction between Peter and Yah Yah and [an] inordinate amount of attention shown him by her".

home with black crepe around them" may be displayed forever, and people wear or keep in their pocket a picture of the deceased. "Q. Does the keeping of a picture of the deceased parent, has that been found to be detrimental to a child's development? A. I have to answer this generally. Given that these are the Greek cultures, ceremonial way of dealing with death, and given that we all go through the experience if somebody in the family dies, as people we don't have higher incidents of mental disturbances than any other nation. As a matter of fact we have less, but in general this is the custom of the country, and as far as I know there is no study that would suggest that this is detrimental as you put it." We credit this psychologist's conclusion that appellant is amenable to accepting the Human Resources Service (Bureau of Child Welfare) counseling which can help her provide a well-rounded and active environment for this above-average youngster. We agree with the Law Guardian that placement of the boy in this extended family setting is in the child's best interest.[3] Concur — Sandler, J. P., Carro, Fein, Milonas and Kassal, JJ.

## SECOND DEPARTMENT, MARCH, 1983

## (March 7, 1983)

---

3. A formal "opinion" justifying its order was subsequently written and "entered" on February 17, 1982. Our disagreement obtains to the findings and conclusions stated therein, as well.